My name is Dennis Reardon. I represent Appellant Montesano and counsel, according to the court's direction, have consulted. We've agreed to split time. I will take ten minutes on some of the lead issues. Co-counsel will divide the remaining time. We intend to leave a couple of minutes for rebuttal, perhaps two or three. Your Honor, because of the rather strange way the government pursued this case, it's given rise to some important issues of first impression. Strange, I say, because it's clear that there was securities fraud involved in this case, and it was Mr. John Laurenti who was responsible for it. He owned this company. He had house stock. He had these arrangements to get the stock and pump and dump it. The government's own witnesses said that the brokers who were being prosecuted and are now before you really had no knowledge of the whole arrangement, the investment arrangement, how the stock was obtained, and how Mr. Laurenti was making profits. Now, Mr. Laurenti received a 16-month sentence, and our clients mined 30 months and up from there. The significance of that is that because they did not know about this pump and dump scheme, the government had to be creative in the way that it pursued the securities fraud case against them. And what's remarkable is that the government will have to concede, does concede, and it's free, that no one, no broker has ever been convicted of securities fraud, ever, on the theory that he acted fraudulently by not disclosing commissions. It's a completely novel theory. It's never been... If you characterize it that way, it sounds very novel and exciting. But what really is at issue here, it seems to me, is a garden-variety conflict of interest. In other words, that a person, whether or not a fiduciary, can't be profiting from a transaction like this without informing of a conflict of interest, just as if they were the owner of the stock and selling it, or for any other reason. Your Honor, yesterday I went to rent a car, and if you've had the same experience, the person there says you really ought to get the insurance, the double insurance, the peace of mind, and so forth. You really ought to take it. The reason they do that is they get a commission if they sell that insurance. If you go buy clothes, many of the people who are salesmen, salespersons there, get commissions based on the amount of clothes that they sell. They don't disclose that. That is not fraud. And the fact of the matter is that Skelly says the rule is the same in securities. It is only, only if there's a fiduciary duty that the obligation to disclose arises. Well, if there is a conflict of interest, which you are not actually, you hadn't really answered whether you think that's a conflict of interest. If there is a conflict of interest, is there still a fiduciary relationship required, or is that a subsection B problem where there's no fiduciary relationship required? Well, let me say that you could have a general conflict of interest, but the government specifically says. I don't want to know what the government said. I want to know what you say about conflicts of interest. If a person has a conflict of interest, are they required to disclose it? And if so, is it only because of a fiduciary relationship in the securities context, or is it more general than that? Well, Your Honor, I would submit that in the securities context, the obligation to disclose commissions specifically. I don't want to know about commissions. I would like you to answer my question, even though I understand that you disagree with the premise of it. If there is a conflict of interest, does a broker have a duty to disclose it? And if so, is it dependent upon a fiduciary relationship or not? Your Honor, let me answer it directly. If there is a conflict, I mean, that could encompass a great many things, I suppose. Yes, it could. But my answer would be that absent a fiduciary relationship, the obligation to disclose many things which might be conflicts of interest, that is the brokers looking out for themselves more than their client, arises only in the context of the fiduciary relationship. And, therefore, in this case, in order to make the government obtain the conviction without a finding, they didn't argue that there was a fiduciary relationship. The jury wasn't instructed that there was a fiduciary relationship. Why wasn't the jury instructed? Well, that's the question. It wasn't subjected to the instruction. Well, Your Honor, let's say this. If you have a felony murder instruction, a defense attorney may say, look, that doesn't apply here. I object to it. If the government says, I want felony murder, and the court is then aware of that and they're going to proceed on a felony murder theory, the court can't give a defective instruction. Once the government said, our theory is, and it's the only one supported by case law such as Skelly, that we can proceed on the failure to disclose commissions if there was a fiduciary relationship, they revealed to the court that that was an element of their defense and of their theory of liability. And the court then had an obligation to instruct on all the elements of the theory. Why isn't that an invited error, though? Because lawyers all the time have alternatives. In other words, it's absolutely an everyday occurrence for a lawyer to say, we don't think that this instruction is called for because there's not a felony murder situation. But if the court is going to disagree with us on that, here's the correct instruction. At least don't do it wrong. I mean, lawyers do that all the time, and it doesn't give up their primary position. Well, that's certainly true, Your Honor. In this case, there is absolutely no indication that certainly Mr. Montesano and the rest of, at least several of the defendants, and then let me speak for themselves, ever objected to this instruction. The record is silent as far as they're concerned. But if it is the case, and the government agrees with this, that there is no law supporting the theory that an undisclosed commission in itself is fraud. And the only law context in which it arises is if it's undisclosed in the context of a fiduciary relationship. These defendants were convicted, with the government urging that as being their primary theory of liability, without any discussion, any conceivable finding by the jury that there was a fiduciary relationship in the case. And the court was certainly on notice from the government that its theory required proof of a fiduciary relationship. So I think the issue is preserved for this court's. There were also other instances besides the failure to disclose the bonus compensation. For example, pumped up assertions about the value of the stock and how good it was going to be for people to. There were a number of fraudulent acts apart from that that were pleaded and proved. That's correct, Your Honor. But we have a situation where the first fraudulent allegation in the indictment is failure to disclose commissions. We've cited the instances in which the government says, hey, failure to disclose commissions in itself is a material misrepresentation that constitutes a basis for liability. It's impossible on this record to say that the government didn't, that the jury didn't rely on the government's theory as expressed, which was simply that and nothing more. An undisclosed commission is enough to convict. And they're simply, the problem is the theory is defective. Let me make one point about that, because we've argued, the government agrees that there is no authority in the Ninth Circuit that would say an undisclosed commission is securities fraud. In December, the wire rack and black cases were argued before the United States Supreme Court. And anyone who reads those arguments, and I argued on a services case two days later in this court, and the court said we're not touching this until the decision comes down, because we've read that oral argument as you have, and it appears that the United States Supreme Court is going to make a major decision saying that this statute has to be struck on due process grounds because it didn't give adequate notice of the conduct which is prescribed by it. And I submit to the court that until the black and wire decisions come down, if they do follow that track, that at that point, this court is going to have a major Supreme Court decision on whether anyone could be convicted on the theory that the government urges here because it admits that there is no case that says, certainly in this circuit or anywhere other than the Second Circuit, that rests criminal liability on a failure to disclose commissions. And, of course, the Second Circuit makes it dependent on a finding of a fiduciary relationship. It's a different statute. You're arguing that if the Supreme Court decides those cases in the way that you think it will, that Scali is no longer good law? No. Scali is a case which predicates the existence of a duty on fiduciary relationships. I understand that. I'm trying to understand your argument. Yes. Let me say this, Your Honor. My argument is simply this, that that case will say that there has to be clear notice of prescribed conduct, that the argument is that in this case, there was an argument that an undisclosed commission alone is sufficient to support securities fraud, and it appears that they will make statements in Wyrick and Black that would present a compelling argument that no one was on notice that the failure to disclose a commission in this context could be the basis for criminal liability. I don't want to impinge on my co-counsel's time. The other issue of first impression that really has to be dealt with here is that in the wake of Prenby, it is very clear that we have this weird statute where it doesn't require willfulness in the sense of a violation of a known legal duty to convict, but it does require knowledge of illegality to impose a prison term.  In other words, it can't be decided by courts, because the difference between a fine and imprisonment is, under Justice Scalia's opinions, obviously a different offense. There was a requested instruction here that the jury pass on the issue of knowledge, and it was rejected, and the court confronts in a way that Torello or the Reyes opinion cited recently doesn't present, the question of whether juries have to decide and have to be instructed upon the no-knowledge element in order to lay a predicate for a prison term. Thank you, Your Honors. I'll defer to other counsel. Good morning. Good morning. May it please the Court, Jonathan Libby appearing on behalf of Appellant Brian Morienti. Your Honors, given the extremely limited amount of time, I do not intend to address Brian Morienti's legal sufficiency, individual legal sufficiency claim, unless, of course, the Court has any questions. I would ask the Court to, however, look very closely at the briefing that we filed on that issue and the record, because it appears to me that the only thing Brian Morienti may be guilty of is being the brother of John Morienti. That said, unless the Court would like to focus me elsewhere, my plan is to address the expert witness issue, and then if I have any other time in the eight minutes that I've been allotted, to discuss the loss calculation. What exactly would your expert have said that he didn't get a chance to say? Well, Your Honor, there are a number of areas that the Court precluded him specifically from testifying to. These include, among other things, whether disclosure of bonus commissions is required under the NASD rules or just typically within the industry, which is certainly very significant in this case. But he was precluded from testifying with respect to the broker's duties and responsibilities vis-à-vis stock predictions, good faith, due diligence, disclosure of management activities to clients. As I said, disclosure of bonus commissions, receipt of commission overrides by brokers, whether brokers are permitted to complete information on customers' new account agreements, the suitability of investing in high-risk transactions by clients in general, and with respect to Brian Morienti specifically. The discussion of risk with clients with prior investment experience, the requirements of executing clients' trade requests if contrary to investment strategy, and the responsibilities of non-supervisor brokers vis-à-vis other brokers. He did testify about some of what the NASD rules permit, if I understand correctly. As a summary witness, he did. What is a summary witness? I'm not familiar with that term. Well, a summary witness... Outside of the witness who testifies about voluminous documents, I'm not familiar with the... That's exactly what it is. It would be a witness who is permitted to testify with respect to voluminous documents. Summarizing voluminous documents. Right. What voluminous documents was he summarizing? Well, he was basically... We had a number of charts. Brian Morienti presented a number of charts that deal with... Charts are not voluminous documents. Well, and summarizing... Well, it had to do with much of what took place in this case in terms of the stock market crash at the time. It sounds like he's being portrayed as sort of like the cleanup hitter here. He's going to come in and summarize the case. Well, in some ways, I suppose. I mean, the government's witness, the attorney from the NASD, she also testified as a summary witness, summarizing some rules of the NASD. She also was not testifying as an expert, but as a summary witness. Let me just be sure I understand the nature of Mr. Myers' proposed testimony that was disallowed. It seemed to me that all of it went to the theory that we were discussing with your co-counsel, that is, this issue of whether you want to call it bonus commissions or conflict of interest, however you want to characterize it. That was the topic. His testimony, I did not think, went to any of the other theories of criminal liability, including pushing the stocks without looking at client suitability, unauthorized purchases that people didn't order, failing to make trades that people had ordered in a timely fashion, that sort of stuff. He was not going to testify about any of those other bases. Is that true? Well, it's not clear what all of counsel would have, in fact, asked him. I mean, from our perspective. What the record shows about what was proffered, it seemed to me to all go to that one theory. That's correct. And if you look at the record, Your Honor, with respect to Brian Lorianzi, bonus commissions is pretty much all the government has alleged he, in fact, took. When you look at the conspiracy and you go through all of the allegations in the conspiracy, bonus commissions applies to Brian Lorianzi. None of those other things apply to him. Did Ms. Lee testify about the need to disclose the commissions? I'm sorry, Your Honor? Did the government's expert, Lee, is that her name, Ms. Lee? Ms. Lee. Did she testify that the commissions are supposed to be disclosed? I honestly do not recall, Your Honor. I don't recall. What we do know is this Court's case law is very clear that expert testimony is to be liberally admitted. And so long as the individual who's proffered has sufficient background and experience in the area in which he's going to testify. Again, that was as to the NASD rules? Is that the primary way?  Your Honor, I'm still having trouble putting down exactly what it was that would have been helpful to your client if he were allowed to testify. What was it in particular he was going to testify to and he couldn't? Well, certainly the rules of the NASD and, in general, the policies and practices of brokers in the securities business. But didn't that come out in the course of the trial for the most part anyway? I mean, what was it he could testify to and no one else could as an expert? Well, an expert has the imprimatur of someone who knows what he's talking about. And so that makes a difference. Well, as to what issue, though, was it the jury needed to know that information? What information did they need to know they didn't get? Well, in our opinion, that an expert with experience and knowledge of the securities industry and the rules of the NASD would be able to say that your client to inform somebody did it. I mean, they didn't have that as part of their proof. No, but he would have testified that bonus commissions are very common in the securities industry. Would he have testified they don't have to be disclosed? And he would have, in fact, said that, that they would not have to be disclosed. And as an expert, with that mantle of expert, that would have carried a much greater weight with the jury. Well, if he were allowed to testify as to that one particular point, but as was pointed out, there was a number of allegations that the government had that were proven in the course of trial as to the conduct of your client and others in selling the stack and talking people out of transferring the stack and especially the company stack. Well, I'll submit, Your Honor, those allegations actually were not made against Brian Marianti. They perhaps were made against the other defendants, and that certainly was the government's theory, and those were the overt acts alleged in the conspiracy. But as we detail in our individual legal sufficiency challenge, going step-by-step through each one of those overt acts, they simply did not apply to Brian Marianti. There was nothing else to support the conviction of your client other than the sale of the jury's disclosed information? He did not disclose bonus commissions and apparently attended a meeting. Beyond that, what the government has argued is that he was Brian Marianti's brother, but the layout of the office was such that he had to have known what was going on around him. Well, there was evidence that he was part of this conspiracy. There had to be. Well, I mean, what they're suggesting is he had to have known what was going on around him. Essentially, as I read the government's argument, it's a mere presence argument that he was there. So he had to have known what was happening. We submit that that was not sufficient. I assume that charge was given to the jury by the discord judge, too, that mere presence is not sufficient. I believe it was, Your Honor. I think in this case the jury got it wrong, and that's why we have submitted a legal insufficiency charge. What did the judge exactly instruct on the question of disclosing the commissions? What was the judge's instruction? Honestly, I don't know, and it would probably take me a little while to pull that out. Excuse me. I thought with respect to your client there was at least one former client who testified to an unauthorized purchase. Mr. Rodriguez, am I? Ms. Rodriguez may have. Well, we can check that. It seems to me that there were other things involving your client besides the failure to disclose. Well, on that I would submit on my brief on that point. What I'm trying to get at, I'm trying to figure out what exactly your witness would have said that would have been critical, given what the instructions were as they were actually formulated and given. Well, I went through the list, and I'm not sure that I can really explain any more. Well, I mean, if the judge says, I don't recall the instruction, but if the judge says you have to disclose commissions, if that was the instruction, it doesn't matter what the NASD rules are, does it? No, but again. Is that sort of trying to figure out what's the relevance of what your guy would have said? Well, Ms. Vermeyer also would have discussed what the practices within the securities industry are. He doesn't make what the practices are. If he's required as a matter of federal law to disclose it, it doesn't matter what the practices are. Well, and obviously that's an issue that we have before this court, whether or not in fact that is an issue of federal law that requires such disclosure, whether or not that in fact is fraudulent activity. I mean, the judge instructs the jury, not the witness, on what the law is. That's certainly correct. Tell me again, in 25 words or less, what's the best thing Mr. Meyer would have said for your side? He would have given greater background on the securities industry. Okay, greater background doesn't strike me as reversible error. And he would have explained that incentivized commissions, that incentivized payments, bonus commissions are common practice within the securities field, and that the receipt of these bonus commissions, as the government has coined the term, was perfectly common, and what happened here was But there are a lot more acts proven on behalf of this conspiracy in the course of the trial. And, of course, as a co-conspirator, the jury would have obviously found him to be a co-conspirator, he's responsible for the acts of his fellow co-conspirators if they're done for this conspiracy, is he not? So everything that was done That's correct. In fact, he is a member of the conspiracy, and we would submit that he in fact was not. Well, but the jury found he was. That's right, and juries get it wrong, and that's why we have the court here to take So you're saying the evidence is sufficient to convict your client? Correct, that it was insufficient to convict. Do you want to pass the baton? I do. I want to discuss a little bit about loss, but I will pass it on to Ms. Lando. Your Honor, Ms. Lando has ceded me 15 seconds to give a direct answer to the court's question. Okay. The jury instructions did not mention disclosure. There's no mention of it. Just as false statements are, material false statements are a crime. The government argued the failure to disclose was a material omission, but the instructions did not refer one way or the other to disclosure. Do you have a comment on what Myers would have added to this? Yeah, he would have said the government is arguing to you in closing, or they did, that a failure to disclose is a material omission, and the practice is very common, and it's accepted that you don't disclose commissions. So in that sense. All right, Ms. Lando. Good morning. I'm Karen Lando, and I represent Curtis Parker. I'm going to be just addressing the issue of restitution. As this Court is aware, restitution is different than loss. It's limited to actual losses. It can include consequential damages. And there's two aspects to loss. There has to be but-for causation, and there has to be transactional causation. Yesterday, this Court issued another opinion, and I apologize for not having a 28-J, but it was issued yesterday, U.S. v. Andrews. Could you do a gum sheet with the deputy clerk afterwards with the citation? Certainly, Your Honor. And for opposing counsel. Absolutely. It's not direct. The language of the opinion is noteworthy because it reiterated this Court's holding in U.S. v. Gamma Tech and reiterated that when there's an intervening cause, the government has to prove that the loss is directly related to the defendant's conduct. So here, I'm not going to take too much time, but here the government used a valuation method that did not result in a reasonably accurate assessment of restitutionary loss. And I think the best piece of evidence is that the government has conceded, as to Mr. Parker, that the loss is overstated by at least $550,000. Because using their valuation method, the government missed the fact that at least two of the identified clients had sold the stock. Well, one may have actually made a profit, not sure about that. The other one lost not $1.1 million, but about $500,000. Of course, Mr. Parker's whole restitution award was $1.8 million. So that's a third of the restitution that we know is wrong. Okay, but they agree that the restitution... They agree that that is incorrect. But the point is, is that given the government's valuation method is simply not a reasonable method for estimation in this case. Now, the government has... Let me just ask you, the standard for the amount of loss calculation is different than the standard for restitution. Yes. Restitution clearly has to be very precise, whereas there's permission for some level of estimation in the loss calculation. How does that difference inform our decision? Well, as I said, I'm not sure, Your Honor, if you're asking me about loss or about restitution. You mentioned loss, I thought, in your previous comments. Well, I did, but I was really addressing my comments to restitutionary loss. We have argued that a market-adjusted loss was necessary here, both for loss and for restitution. But I would argue that it's even more important in the case of restitution because the losses here occurred in the context of the dot-com crash. And as we all recently learned from the financial and the subprime crash, there are things out there that are much greater than any kind of fraud. The fact is these stocks were part of a lot of people wanted to get in on these stocks. People were investing wildly. And so it's, you know, given that the losses occurred, at least in part because of the dot-com crash. I want to make sure I'm zeroing in on what you want us to do. You say that the restitution award is defective. They agree with you and says it has to go back.  What more do you want to say? Well, Your Honor, the government agrees with me as to Mr. Parker's two losses. But there are other losses. The government, I think, has agreed in their brief as to the losses as to two victims. But there are other losses at issue here. And what we are arguing is that the valuation method adopted by the government is fundamentally flawed. And so we are asking for a remand to require the government to prove actual losses with regard to each victim. Now, while they stated that this was difficult, in fact, the government is in contact with the victims. And so rather than relying on this estimate that the agent came up with, which was three cents to share in the case of EMBU and other amounts regarding other stocks, I think it's appropriate to require the government to prove each and every victim's loss. And that's what we are asking for. For the restitution purposes? For the restitution, yes. Got you. Okay. If there's no more questions, I'll leave my time to Ms. Ayala. Thank you. Good morning. Good morning. May it please the Court. I'm Irina Ayala, and I am the attorney for Mr. Donald Samaria. And if I may answer a question that was raised a moment ago regarding Mr. Paul Mayer, who was the witness, Your Honor. I happen to be the only one who was actually at the trial, and I actually brought my notes, if I may, to the Court and let them know that Mr. Mayer had about a 26-year employment record in the securities industry as a broker, branch manager, regional manager, held seven licenses, and also an arbitrator with the NASD and the New York Stock Exchange, a very competent individual. Although he was not allowed to speak as an expert, he did give some insight to the Court that I hope this Court will also consider. I'm not clear what you mean when you say he wasn't allowed to speak as an expert. No, I'm sorry, Your Honor. Judge Hatter declined to stand up and declare him an expert, but allowed him to answer some questions and express opinions. Yes, he did, Your Honor. And if I may, because I actually have my trial notes. They're not too long, Your Honor, if you'll bear with me. It's very common and standard practice for brokerage firms to have a list of stocks that they are recommending for purchase, recommending to their clients for purchase. Firms then encourage brokers to promote those short lists to their customers. It's not unethical. It's done at every major firm. All major brokerages engage in some type of stock sponsorship. It is not unethical. And it's very common that brokers get paid different amounts of money for different investments or types of investments. It is not unethical. Is this what he was allowed to testify to or not? Yes, Your Honor. This is what he is saying coming out of his words. Well, what was he prevented from saying, I guess? Well, Your Honor, I think what is important for this Court, because obviously we wouldn't be here if we agreed with what the jury decided and what the judge did, the issue before this Court is whether or not the disclosure of these bonus compensation is a problem. Does this constitute fraud? And was it unethical? Was it illegal? And Mr. Mayer repeatedly told the jury, and obviously I'm hoping this Court will consider, that it is commonplace not to disclose compensation. I want to be sure I understand your argument. And I know that Judge Cohen has just asked you this, but I want to be sure that I understand it as well. The material you just read to us, was that testimony that actually was delivered in front of the jury, or was that proffered testimony that was rejected? That was testimony that was delivered, Your Honor, that it was not unethical to fail to disclose additional compensation that was paid for by the company and not taken from the clients. There's something you wanted him to say that Judge Hatter didn't let you? Well, Your Honor, he wasn't allowed to actually be an expert witness, and I think that does create some problems. What do you mean by that exactly? Judge Hatter didn't declare him to be an expert. Correct, Your Honor. But he allowed him to testify to all these things that you have just enumerated. And the reason I'm raising them, Your Honor, is because this is an individual with 26 years of experience in every aspect. But the jury had that information. Yes, Your Honor. When you declare a person to be an expert in district court in a trial, it doesn't mean the jury has to accept the person as an expert. The jury has to decide whether they feel his opinion is worthy of their consideration or not. And we always advise the jury that. So what's the difference whether you declare him an expert? As long as they have the information for his opinion, his background, they decide whether you accept the testimony or not. I think that's true, Your Honor. But let me just make this point again, is that the reason we're here is the question as to a failure to disclose extra additional compensation that's paid by a stockbrokerage company constitutes fraud. And that's the issue that is the government had their position and the defense has their position and we're asking the three judges before me to make a decision. Because if that's the case, Your Honor, then we might as well not even be here. If I understand what you're saying is it was not enough that the witness testified to all those things you just read, but that Judge Hatters should have said to the jury, ladies and gentlemen of the jury, this guy's an expert. That's what you would have had him do. That's not my point, Your Honor. I think the point I was trying to make, because I think you asked what he did testify to and I was just trying to enlighten the Court, that he did make these repeated comments that the conduct that took place at Hampton Porter with respect to disclosure of information was not – was commonplace and not unethical. It was not something that was just going on to Hampton Porter. I was responding to that question, Your Honor, and obviously trying to tie it into the issue of whether a nondisclosure of additional compensation constitutes fraud, which brings us here today. May I continue with my points of view? Yes, Your Honor. We're going to turn it over to the government now. Thank you. Your Honor, I had a number of issues. I'm sorry, Your Honor. I want to – I'll give you another minute, but ask you to keep it to a minute, please. All right. Fine, Your Honor. When you're – and I know you've already reviewed the briefs. Please keep Donald Samaria in mind, Your Honor, as someone who's very different in terms of the conduct that is attributed by the government and the conduct that actually took place. I know Your Honor indicated this concern about inflated prices and expectations. I just want to point out that in my brief, Your Honor, one of the government's witnesses, Mr. Tedesco, made it very clear that house stocks – if I may, just a moment. I'm sorry, Your Honor. An end point. Mr. Tedesco, a government witness, said that there was a house stock that was from $9 or $10 that went to $52 a share. There was also another stock, VTCO, that was at 50 cents that went to $7 a share, and NetUSA that was $1, and it went to $5 a share. And these were information that was provided by the government. So when the Court is saying that there was misrepresentations about how high these stocks would go or what their value ultimately would be, it wasn't out of just whole cloth that was taken. There was actually information from government witnesses and the government themselves that these stocks could dramatically increase over a period of time. And Mr. Samario made absolutely no misrepresentations, no false representations. Okay. Now your time is up. Thank you very much, Ms. Ayala. Thank you, Your Honor. To the government. May it please the Court, my name is Ellen Meltzer. I'm here on behalf of the Department of Justice. Contrary to what the appellants would have this Court believe, this was not a case primarily about undisclosed bonus commissions. Judge Graber got this right. Bonus commissions were never the principal thrust of the case. They were simply one part of an overarching conspiracy by the defendants and by their co-conspirators. Well, everybody did emphasize them. There may be other bases for holding these defendants criminally responsible, but that did seem to be a fairly significant focus of the case. And I'll just go right to what bothers me about your side of the case, and that is the jury instruction. You asked for an instruction that tied the obligation to disclose this type of conflict of interest to fiduciary relationship with the clients. Correct. The Court didn't do that. And that, at least speaking for myself, was a mistake. What do we do about that? I don't think the Court needs to do anything but affirm the conviction because I believe that the defendants waived their right to challenge the lack of the instruction and that that issue is unreviewable by this Court because they vigorously opposed it at trial. Brian Laureanti, on behalf of the other defendants, opposed its document number 444 at page 6, opposed the government's proposed instruction on fiduciary duty. So basically you're saying they put all their eggs in one theoretical basket and it's too late to bring in another basket. That's a terrible analogy. But I'm just trying to understand. So you're saying it's invited error or forfeiture or waiver or one of those things? That it's waiver. Okay. It was conscious, a conscious relinquishment of a known right. Yes, it certainly was, Your Honor. Brian Laureanti argues in his reply brief that he opposed the instruction because the evidence did not support a fiduciary relationship. And he also argues that he said in district court that at the time of the offenses, there was no authority requiring such disclosure. That's not what his opposition says. He never argued in the district court that we hadn't proved evidentiary-wise that there was a fiduciary relationship. So even if you don't have a waiver, your position would be there was sufficient evidence in the record that that was proven that they had to have a fiduciary relationship. Precisely, Your Honor. And I think that there was. Even if a fiduciary duty is a predicate as necessary for disclosure of bonus commissions, I think that the government overwhelmingly proved the existence of that type of relationship. The brokers in this case were not mere order-takers. The brokers were cold-calling their clients. They were hyping thinly-traded penny stocks, stocks that the clients had never heard of and had no knowledge of. Each and every one of the government witnesses who were clients testified that they relied on their broker's recommendations in purchasing the stocks. For example, Robert Rodriguez testified, I trusted Brian Laureate and I thought he was working for my best interest. Mr. Crosby testified, I told Brian Laureate to do what's best for my account. I trusted him. Mr. Knott testified that he trusted defendant Parker's advice. Clint Martin testified that he relied on Montesano's recommendations. What does this prove, what you're telling us? That there was a fiduciary relationship, a relationship of trust between the brokers and the clients. Within the meaning of Skelly, if we were to adopt Skelly. If you were to adopt Skelly, precisely. Change the topic for a second. I'm not sure I understand the logic of Judge Hatter's ruling with respect to Meyer. Did he say that Meyer could not express an expert opinion? Did not have the expertise to express opinions? He never explained why he was precluding him from testifying as an expert witness. I think it's one thing that Judge Hatter said, is that he generally does not permit experts to testify in his courtroom. I don't know what is meant by that. If he means that I don't bang a gong and say you're an expert. A lot of judges don't declare people experts in open court in front of the jury, but they allow them to express opinions, which is what experts can do as opposed to a precipient witness who just has to testify to what he or she has seen. If he says I'm not going to pronounce him an expert, touch him with a magic wand, that's one thing. If he's not going to let him express opinions that he is qualified to express, that's a different story. And I'm not sure what happened here exactly. I think it's more the former. Because Mr. Meyer was allowed to testify extensively as to, as you've heard, the items that they claim they wanted him to testify to. He did testify that incentive compensation is not unethical. He testified that it's not extraordinary to... Wasn't he precluded from talking about the NASD rules? No, he testified briefly about the NASD rules, just as our witness did. I don't believe that he was precluded. Do I understand correctly he was allowed to testify a little bit about the NASD rules, but he was not allowed to say that commissions do not have to be disclosed? Do I have that right? No. Judge Graber, he did testify somewhat about the NASD rules because he testified that failing to follow the rules would not... You've had objections to a whole bunch of questions. You were your predecessor in interest. And I thought the district court sustained quite a few of those objections. I don't recall specifically as to which questions, Your Honor. I know that there were objections sustained as to certain things, but he did testify as to broker compensation and the fact that it is not an unusual occurrence in the industry. I'm not sure what else they would have wanted. Well, presumably answers to the questions she objected to were sustained. So we'll have to go back and look at what those were. I apologize, Your Honor. I don't recall specifically what they were. One of the things that appellants just mentioned is that they wanted him to testify about suitability of these investments for the clients. He did testify to that, Your Honor. He testified that if his security were otherwise suitable for a client, it's not unethical to recommend it just because a broker received extra compensation. And, in fact, he analyzed the clients that Brian Laureante had and talked about how the stocks that they purchased were suitable based on the account forms that were submitted. So I think that just about everything that they wanted was before the jury. Again, if I can go back to my initial argument on this being a case about a lot more than just bonus commissions, it's the government's position and, in fact, the indictment alleges and the government proved at trial that a variety of fraudulent sales tactics were used to convince the clients of this company to purchase the house stocks and that, unknown to these clients, there was a no net sales policy which was carried out through various sales practices, only one of which was bonus commissions. To begin the indictment charged an overarching conspiracy to fraudulently sell securities to Hampton Porter clients. The indictment listed nine separate sales practices in which the defendants engaged, including using false statements to their clients to induce them to purchase the stocks, the payment of the bonus commissions, but in addition, the no net sales policy so that clients could not net sell securities into the market, which would have depressed the price, which would have hurt Hampton Porter's pump and dump scheme. The unauthorized trades in customers' accounts, the parking of securities in customers' accounts, the cross-trading if a customer insisted on selling, and the trading of stock while brokers were not registered with the NASD so that the stock was sold using another broker's number or the number of Hampton Porter. The trial record showed extensive testimony about the no net sales policy and contrary to what Mr. Loriente's attorney just argued, there was a lot more testimony about Mr. Loriente at trial than just the bonus commissions. When Robert Rodriguez attempted to sell his stock, Brian Loriente told him that the time was not right to sell it. When Mr. Foose wanted to sell his stock, Brian Loriente told him that the time was not right. But more importantly, there was evidence of unauthorized trading by all of these defendants in their clients' accounts. Are these charged in different counts? Yes, they are. Some are charged in different counts, and then there were additional witnesses that also testified just as part of the conspiracy. How would each of these different things, as I recall, it's not charged in one count that there was unauthorized trading and in another count that it was misrepresented about the time to sell? That's correct. How do we know what the jury hung its hat on? It's a general verdict, wasn't it? It wasn't count by count like that. That's correct. It was a general verdict because How do we know they didn't just rely on this failure to disclose commissions theory? Because the government submitted overwhelming proof as to all of the other facets of this theory. That's not what I asked. How do we know which one they hung their hat on? We don't really know. You may have had proof on a bunch of different things, but we don't really know which one caught their eye. No, but the court doesn't have to reverse if there is sufficient proof in the record as to the other facets of this theory. Unless the one is legally insufficient. Correct. So we still have to decide whether it's a legally sufficient theory. It's the government's position that even if bonus commissions do not have to be disclosed, that that was a factual insufficiency, that it's just one facet of what the government charged that it would not have proved. They're all convicted of conspiracy, is that correct? Excuse me? They're all convicted of the conspiracy? Yes, they were each convicted of the conspiracy and of the separate counts on which they were charged, depending on who their clients were. I have some questions for you about the loss calculation. The government can pick between actual and intended loss, and as I understand it, the theory was actual loss. But then we get into issues of trying to estimate the loss. Would you go over for me just aloud what your theory is and why it is sufficient? Because I had some problems with it. On how loss was calculated for the purposes of the guidelines? Yes. Restitution is in a different bucket for the moment. The government took the blue sheets and the other information that it had as to when stocks were sold, and it valued the shares of clients and their loss as of certain dates. But it didn't offset gains. It offset gains within a particular house stock, but it did not offset gains of one house stock against another house stock. I don't understand that, because in theory, the house stocks, I guess there were four of them, if I'm remembering right, they all suffered from the same defects, the pump and dump and the failure to trade when someone wanted to trade, and all those things were true of all four as a group. So if the crime is trying to manipulate the trades of this group of stocks, I don't really understand why you wouldn't look at offsets for the group. We didn't look at offsets because it's our view that the defendants would then be benefiting from having pumped up the price. Well, but you allowed it if it was in the same stock, so what's theoretically different of saying, well, if you only traded in stock A and you lost $100,000 but then you gained back $50,000, so the net loss to the client was $50,000, wouldn't that also be true if you were looking at stocks A and B? You lost $100,000 in A and gained back $50,000 in B. It doesn't seem to me theoretically different once you allow it within a stock why you wouldn't do the same between. I'm not sure I'm expressing it well, but I didn't really see a theoretical difference that supported what you did in that regard. I can't explain it any more than what our position was, that it was our view that if they had pumped up the price of VETCO, they shouldn't benefit from that pump when a client lost money in another stock. The court may disagree with it. It's the same client. Yes, Your Honor. I'm only talking about within one client, one defendant. I understand, Your Honor. In what way was the restitution order defective? The restitution order initially was defective as to Bryant-Loriente because a final order had not been issued at the time that the court first, excuse me, that it was issued prior to a hearing that he had on the restitution issue and it shouldn't have been issued prior to the hearing. As to Mr. Parker, excuse me, Your Honor. As to Mr. Parker, there were amounts that were overstated and the government conceded those in its brief. Did that affect the loss calculation? No, it shouldn't affect the loss calculation, Your Honor. But what about the reverse? If, and I know you don't concede this, but if my theory about offsets or my question about offsets results in a conclusion that the four stocks should be lumped for that purpose, wouldn't that affect restitution as well? Yes, it might, Your Honor. Okay. So it doesn't work upstream, but it works downstream. Yes, it might. Was the problem with Loriente's restitution ever corrected? Yes, Your Honor. The only one that's not corrected under your theory is Parker's? It was Mr. Parker. Yes, and that was the separate appeal of Mr. Loriente. The judge did issue a final order after the hearing, and in fact amounts were lowered, which the government conceded some were overstated. And the amount went down, I believe, by about $300,000 when the final order was issued. If I can say one more thing about Mr. Loriente, Your Honors. Again, as to his claim that he didn't do anything except bonus commissions, Mr. Loriente engaged in serious unauthorized trading in the Crosby's account and in Mr. Rodriguez's account. In the case of Mr. Rodriguez, after he complained it was eventually corrected, as far as the Crosby's are concerned, Mr. Crosby instructed Brian Loriente back in February of 2000 that he wanted to reduce the margin balance in his account, and he wanted to withdraw $200,000. That never happened. He never got the $200,000 that he was asking for for his income tax. Instead, Brian Loriente purchased more than $700,000 in on-point, on-margin, without Mr. Crosby's knowledge and without his consent. He told another broker that he wasn't going to send the $200,000 that the Crosby's wanted to pay their income tax, because in his words, you don't withdraw money from a brokerage account. So there was a lot more to Mr. Loriente's conduct in this case than just the payment of the bonus commissions. There was unauthorized trading by the other brokers, too. Mr. Parker traded in Billy Knott's account in EMVU without his authorization. He converted $260,000 of Dr. Simmons' shares into EMVU that had been in Intel, and there were approximately $200,000 of unauthorized trades in the Gowans' account, also by Mr. Parker. As far as Samaria's claim that he did not engage in a conspiracy, Mr. Samaria was partners with Mr. Parker. As one of the brokers said at trial, they tag-teamed each other. And Mr. Parker was not registered to sell securities with the NASD almost the entire tenure at Hampton Porter. Were any of the counts that the defendants were convicted of have to do exclusively with the failure to disclose the bonus commissions and nothing else? No, Your Honor. For each client who testified, so for each count, there were various fraudulent activity that occurred in their account. It wasn't just the bonus commissions. For each one of them, it was bonus commissions, but in addition to that, there were fraudulent statements to induce them to buy. In many cases, there were unauthorized trades, and in many cases, there was also flat-out refusal to sell when these people wanted to sell their stock. There were cross-trades in some of their accounts, and for Mr. Samaria, he was using – excuse me, for Mr. Parker, he was using Mr. Samaria's broker number in order to get bonus commissions, in order to put the trades through. In addition, Mr. Montesano sold stock to Clint Martin, although he wasn't registered in Texas, so he used the house number for that. So, no, basically in answer to your question, for each count, there was a lot more than bonus commissions. The government also submitted extensive evidence of Hampton Porter's market dominance and control of house stocks, especially in EMBU and in NetUSA. The testimony by Mimi Lee, the attorney from the NASD, showed that Hampton Porter clients were responsible for 46% of all the retail purchases in EMBU and 97% of all the cross-trading in that stock, 33% of all the trades in NetUSA and 92% of all the cross-trades in that stock, 15% of all the trades in OnPoint and 35% of all the cross-trades, and 23% of all the trades in Vetco and 20% of all the cross-trading in that. So there was a lot more to this case than just the bonus commissions. And again, it's the government's position that if, for some reason, this court finds that the defendants did not have to disclose the bonus commissions, meaning that the failure to disclose them was not a material omission under Rule 10b-5, that there was substantial other evidence as to other violations of the rule, both as to material omissions of the fact of the no net sales policy and the fact that they would not be able to sell their stock, and that wouldn't require any fiduciary duty, but moreover violations of 10b-5, A and C, because of the unauthorized trading, because of the cross-trading, because of the outright refuses to sell, and because of the manipulation of the price of house stock. Unless the court has any other questions. Thank you, Ms. Meltzer. Mr. Reardon, are you going to close for everybody? Thank you. Yes, thanks. I know you would want this to be short, quickly. Let me give you a better answer to Judge Graber's question. I honestly don't know. I don't know enough about securities law to know that if some general conflict of interest exists, the failure to disclose it would be a material omission for the purpose of securities fraud. What I do know is that that conflict of interest was not charged or argued to the jury in some general sense. The specific argument was that a failure to disclose commissions was a material omission. And if that is, and I submit it is, a legally defective theory, because that is not illegal, then the court has to confront that and decide, A, whether it will accept that, or, B, whether it will go the Scali rule. If it goes the Scali rule, then the jury was informed that any failure to disclose was a crime. When Scali says, no, there has to be a fiduciary duty, the position of the defense, Mr. Laurienti alone, actually, was, hey, there's no authority in this circuit to support it. I object to that theory that it can ever be a crime. How does he preserve that? I object to it, but if you're going to give it, I don't object to it. And the other three defendants, if this is a tactical waiver. Well, let me ask about that piece, because for the most part, the defendants joined in everything each other did on generalized objections. Obviously, there were specific things about specific counts. Are you contending that the objection to the otherwise potentially correct instruction was not made on behalf of all the defendants? Well, if we're talking about invited waiver, Your Honor, which requires a tactical purpose, yes. For the purpose of the invited waiver doctrine, I would say silence is not sufficient to indicate. That's what I'm, did anyone else either explicitly, did anyone else join in this, either right at the moment or by saying, we all are going to rely on so-and-so's objections to the instructions? Your Honor, my reading of the record is absolutely not. I will point out that under this court's case, Leal-Cruz, cited by Ms. Landau, an objection to an inadequate instruction does not invite, constitute invited error. Well, if the instruction was correct, see, that's the problem. If the proffered instruction by the government was 100 percent correct and the decision was made, well, we want to go for the whole thing. We don't want fiduciary duty. The government took it upon itself to prove the fiduciary part, and they thought they had to, and they did, and they proffered an instruction that said they had to. And at least one defendant said, no, no, never, it's never, not even with fiduciary. So if that was a tactical decision, not to come in and say, no, they didn't prove it was fiduciary, or so on and so forth, to say, no, it never applies, not even to fiduciary relationships. So if that was an invited error, you're saying it applies only to one defendant? I would say that, Your Honor. However, in this situation in which you're saying, look, there's no authority in the circuit, how do you say, don't give that instruction, but do give that instruction? Because it's key to the government's theory. They said, we need it, but they now say it was absolutely key to the legality of their theory, and it wasn't given. I do have to say that the government is absolutely wrong if the court finds that the theory of undisclosed commissions was legally defective, because then it isn't whether they're sufficient evidence. No, I understand that, but they don't concede that it's legally defective. No, but I submit to the court that no one's saying the evidence to support that theory was insufficient. There were clearly undisclosed commissions. The argument was it's not a material omission. So if that argument is correct, then the court would have to find beyond a reasonable doubt that the jury did not rely on that lead claim, but relied on the other things, and it doesn't matter how much evidence there was, because the test is, can you say beyond a reasonable doubt that the jury did not rely on the defective theory? If it's only a factual question rather than a legal defect. If it were only a factual question, right. But no one would contend, oh, you should reverse it because there was no evidence of undisclosed commissions. Of course there was a ton of evidence of undisclosed commissions. The argument is not. What about fiduciary relationship? Would you concede that there's also plenty of evidence of fiduciary relationship? If you look at the Skelly test and they cite it in their brief, it's five factors. It's very complicated. No one could possibly say that there was overwhelming evidence such that any jury, even though they weren't instructed on that necessarily element of the crime, would have found it. It's five parts. The prosecution never argued it. He didn't say here's the five parts and then cite them and you can say, oh, well, the jury obviously found them. They were never even informed of the term fiduciary relationship. So it can't be harmless error. And Judge Skull and I would submit that the conspiracy charge here is based, for these defendants, on the same acts or omissions as the securities fraud charges. So if the undisclosed commission is a defective theory and it avoids the securities fraud theory, then it's going to have to avoid the conspiracy to commit the securities fraud as well. Why? Because you cannot say that the conspiracy is the evidence was the same for all of the charges. Conspiracy is the intent to defraud. Conspiracy requires intent to defraud. And the evidence of. . . That's the basis for the conspiracy. And there's overwhelming evidence of that. Your Honor, the question isn't overwhelming evidence. The question is can you say that the jury did not rely on, if you find the theory defective, can you say that, oh, they relied on securities fraud, but did not rely on that theory to convict these defendants of conspiracy to commit securities fraud. And I would submit to you the error applies equally to all of the counts. Thank you, Henry. And thank you, counsel. Thank you, Ms. Meltzer. The case just argued is submitted. We'll stand in recess for the morning.
judges: Scullin, Silverman, Graber